Good morning, Your Honor. You may please report Frank Bowles in the hearing before the Petitioner. At the outset, it's clear that the Petitioner does have a subjective fear. There was no question as to his credibility. The only question here is whether or not the harm that he suffered is congruent with our asylum laws. And I must also freely acknowledge… Why don't you try to keep your voice up a little, huh? Keep your voice up. Keep your voice up. Thank you, Your Honor. We're all getting a little old, you know. At least I am. The question here is attempting to conflate the whistleblower doctrine. It is freely acknowledged here that the corruption that was exposed by the Petitioner was initially from private actors. He was a crewman on a ship. There was corruption, obviously complicity between the commercial shipping interests and the drug traffickers. What happened… But, you know, let me tell you something. You're talking too fast, and you're not enunciating each word. And so it kind of blurs for me. I'm from New Jersey, Your Honor. I speak too fast. New Jersey's fine, you know. Okay. Blow into the mic. Yeah. That's good. Get your mouth closer to the mic. You'll be heard better. Yeah. Very good, Your Honor. Okay. Go ahead. The essential point here is the concept of the whistleblower. And in a particular case here, Petitioner exposed private corruption initially, corruption between the commercial shipping interests and the drug traffickers. There was a police investigation. What happened then is he, as a law-abiding citizen, went to the police. He not only was met with indifference, it became frighteningly clear that there was complicity between the police and the drug traffickers by the simple fact that… were going after your client on one of the protected grounds because of his religion, because of political affiliation, something like, you know, one of the protected categories, then it doesn't matter whether or not the police were in on it. Right. All it seems to me you've shown is ineffective police work or possibly corrupted police work where the police are complicit with common criminals who are persecuting your client, you know, for their criminal ends, not because of one of the protected grounds. Well, that's where I'm attempting to show that this type of attempting to expose that corruption is, in fact, the political opinion that is contemplated by… What did he do to expose this corruption? All that a simple crewman could do is go to the police multiple times and be met with indifference and then with frightening… Well, that meant he went to the police. Police didn't respond to his calls. That shows corruption. That shows indifference. If he then had gone to the newspapers and said, look, the police are corrupt, and they had gone, they had tried to persecute him because he denounced the newspapers or to the political process or maybe to the international community, and then they had gone after him for complaining about the police misconduct, then maybe he'd have a claim of political persecution. But it doesn't seem to me like he did that. All he did is he got into difficulty with some criminals. He went to the police. Police didn't do anything about it. Let me ask you this. Let me ask you this. Maybe I got the story wrong. But was he the one that reported suspected drug activity on the ship to the police? Ultimately, he did. What happened was… Did he? Just, you know, what does the evidence show on that? Well, the evidence shows this. When he was on the ship, it was quite clear to him that… Yeah, they locked him up and all that, yeah. And he went back to the ship the next day, and the police were there investigating. And he freely explained to them his concerns. Subsequently, he made two separate trips. But he didn't initiate. He did not initiate, if that's correct. He did not initiate. There was an ongoing police investigation. He went to the ship the following day after it docked, and the police were there, and he spoke with them. But if I want to address the question… Well, did he speak to the police in confidence? Well, this is where I believe we have more than just indifference. It appears there's a… Well, I mean, did he? In confidence? Yes. Yeah. And here's where I believe we have none. And then where did he speak to the police in confidence? He went to the police station on Tuesday. He went to the police station. Right. And then you're saying that the police then told members of the crew that he was a stool pigeon. Well, I think it was a combination of things. This is where I believe we have the sense of complicity. After his second visit to the police station, he received threatening calls, and they knew the contents of his conversation with the police. This is where we are beyond simple indifference and corruption. We have complicity. At any point in the history of your clients' concern, reporting, dealing with the police, this entire scenario, did the police ever say to him that the reason they weren't acting is because of his political or religious or moral beliefs or something like that? No. There was nothing that overt. We clearly… Did the threats say that? The threats came from the drug traffickers. I understand where they came from. But in the context of the threats, was there any indication that it was on account of a protected belief or ground? Absolutely not, Your Honor. We have to imply… So he's no different than someone on any street of any village in Peru who sees drug transactions. The police come to investigate. They ask him as a proper citizen. He responds to them. When he hears they may not follow up, he goes to the police station and asks them about it. And then he – that person receives a couple of calls. That person, in your view, would be entitled to asylum under our law? On the very now grounds of this, where he makes multiple attempts to simply be a good citizen and go to the police, when he learns that there is more than just this indifference, that there is genuine complicity, at that point I believe, especially given his position, he's a simple crewman, I think we're imposing an onerous burden. At that point he has to go to the 60 Minutes of Peru. I mean, he has to do more. It's not a matter of burden. The statute requires that the persecution, either past or the fear of the future, be on account of a protected ground. And I'm having trouble seeing that here. Well, the protected ground is that he is interested in the administration of justice, the orderly pursuit of the laws. He is showing he's opposed to the corruption that is endemic here. That is symbolic speech. That is political. The fact that he's not a high government official or a prosecutor like we have in the other cases, I don't think we should always mechanically apply the facts of prior cases here. His, you know, indomitable opposition to the corruption here is symbolic political speech. And that's – I grant you there's nothing specific in our prior case law. That's what I'd ask the Court to do to extend that concept. I reserve some time. You want to save some time? Yes. Okay. May it please the Court. My name is Arthur Rabin. I represent the Respondent in this case, Attorney General John Ashcroft. Substantial evidence in this case proves that the Board correctly reached the result that it did. That is, substantial evidence supports the Board's finding that the Petitioner in this case was not being persecuted on account of his political opinion. Why? Well, this Court has set out pretty much in many, many cases that purely personal retribution by a private party is insufficient to prove a political motive or a political opinion of someone, as well as that mere presence of some government interest in the case is insufficient to show a political opinion. And that's what we have here. Petitioner, on the record, never expressed a political opinion. That is, he never testified to one. He never, in his asylum application, said he had one. And there's no – I missed that last – I missed that, you know, start the clock. Start from the beginning. I'm sorry, Your Honor. Petitioner in this case – let's take a look at the paradigm here. That is, how do we reach the on-account-of question? Well, it's either he has to express a political opinion, or one must be imputed to him. Well, there is no – what I'm saying is there is no express evidence on the record of the Petitioner, Mr. Ortega, having a political opinion. Let's move to the imputed part. Did the persecutors, the – What if he had said – what if he had said that the – these were drug police, weren't they? Am I right about that or wrong? Well, Your Honor, the facts – What if – The facts that's found by the immigration judge and adopted by the Board are these. Petitioner – Talked about what? I'm sorry? Talked about what? The facts that were found on the record that the substantial evidence proves, what happened was the Petitioner was just a maritime sailor that happened to be working on a ship that then was taken over by another company from another country. And they started operating a little bit differently. And he received his walking papers, basically. He received a letter of recommendation. We know all that. We know all that. When he went to the police, what did he say? Did he say anything about, I want to help you because I abhor the drug trade? No, Your Honor. No, no, no, no, no. What did he say? Absolutely nothing like that. What happened was he never went to the police. He was standing on the dock looking for work when the police were searching the ship. And somebody somehow pointed him out, and they found out that he was working or had worked on the ship. So they brought him in, in full view of everybody, and they questioned him on the ship. And at that point, he never said, I saw drugs, I want to turn these people in for drugs or anything like that. What he told them was the ship was operating differently or suspiciously, maybe. That's it. That's all he told them. From there on, the so-called multiple attempts to go to the police were not to turn anybody in, were not to help the government. The only reason he went to the police from there on was strictly self-preservation, because from there on, the drug – alleged drug traffickers were threatening him. All he wanted was protection. Thus, he wasn't trying to help the government, and the traffickers were trying to retaliate against him for that. That's not the case here. It's not even there. What we have is purely a person that happened to be a witness or a perceived witness in a criminal investigation, and the criminals, the common criminals, are the ones who are coming after him. So the so-called extension of the law under Brava, the whistleblower law that this government-on-government involvement, that is, a government person turns somebody else in the government in and they're retaliated, Mr. Spruill is asking this Court for an extension of that doctrine toward common perceived criminal witnesses. Well, we submit that that is not justified under these facts and under the law of this circuit. Why? Because that would mean millions of people who just happened to be brought into an asylum, but because the police called on them and brought them in for questioning and then thereafter they were being somehow threatened by the criminals, millions of those people would then be eligible for asylum. I – my guess is that if the mayor and city council of every town in Columbia under 25,000 in mass applied for asylum and accurately reported the extent of narco-terrorism in that country, that your client would be happy to admit them, whatever their numbers. Well, I don't know yet. I understand that's not this case. That's not, Your Honor. No. I don't know what the government's policy would be. But there is such a thing as narco-terrorism. Yes, Your Honor. Absolutely. But we're not saying these people are terrorists. In fact, in his asylum application, or even guerrillas, he makes a distinction between drug traffickers and the guerrillas, the shining path. And he does not say he was being persecuted by the shining path. So we're not – we're not here where this is – even the epithet that they use in the threats against him on the telephone show that they did not consider him to be a government informant, a C.I. What they called him was a stool pigeon. They called him a common snitch, quote, unquote. Those are all criminal terms that used for anybody that testifies in a case. I don't know about my colleagues, but I think you've covered the point pretty well. Well, Your Honor, the point I'm just trying to make, even the – No, I think you've made it. You're right. Okay. And just moving on, I supplemented and cited to this case a case called Kazulin, a 2000 case from this Court. And I'm not – I think you have it in front of you. In that case, this Court found that a Russian merchant marine – and in this case we also have a merchant marine – who also exposed corruption of his ship's captain – now, this person actually did go to the authorities and did expose corruption of his captain – stealing and selling black market goods, this Court found and held that he was not persecuted on account of his political opinion when he was later threatened and beat up, because they found that that was a personal vendetta, personal vengeance taken by the captain. Thus, we would submit that this case before the Court now is more similar to Kazulin than it would be to anything like the case cited by Petitioner's brief that is Grava or Reyes-Guerrero. All right.  Thank you, Your Honor. Very, very briefly. One quick point in terms of the allegation that he was not trying to expose anybody. The record is not altogether clear as to what happened at those conversations with the police, although he went back twice, even though he was under threat. Number two, he did testify, however, inartfully as to a political opinion. He talked – he decried the corruption of his government and the fact that the government couldn't protect him. So, again, it's an implication, but I believe we have what I would call symbolic political speech. This was a man who was willing to stand up, and for that, he suffered persecution and submitted. All right. Thank you. The matter will stand submitted. And now we come to – let's see. Yeah. Mahana v. Ashcroft, that's submitted. Now we come to Ramnery v. Ashcroft. Okay.
judges: Pregerson, Kozinski, Hawkins